Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| JAVIER RAMÍREZ GONZÁLEZ<br><br>Parte Apelada<br><br>v.<br><br>MASTER LINK CORPORATION CARLOS A. MORALES VÁZQUEZ<br><br>Parte Apelante | KLAN202300320 | Apelación procedente del Tribunal de Primera Instancia, Sala de Arecibo<br><br>Civil núm.: AR2020CV00554<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Figueroa Cabán, la Juez Grana Martínez y el Juez Rodríguez Flores.

Rodríguez Flores, Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de enero de 2024.

Comparece Master Link Corporation (Master Link) y su único accionista, señor Carlos A. Morales Vázquez (Sr. Morales), y solicitan que revisemos la *Sentencia* emitida el 13 de marzo de 2023, y notificada el 14 de marzo de 2023, por el Tribunal de Primera Instancia (TPI), Sala de Arecibo. Mediante el referido dictamen, el TPI declaró con lugar la acción de cobro de dinero instada por la parte apelada, señor Javier Ramírez González (Sr. Ramírez). Por consiguiente, ordenó a Master Link y al Sr. Morales a pagar solidariamente al Sr. Ramírez la suma de $118,648.50, más intereses por mora. La parte apelante pide que modifiquemos parcialmente la sentencia apelada, a los fines de eliminar de dicha suma las partidas correspondientes a "nómina pendiente de pago" y "renta de equipos de agrimensura".

Por los fundamentos que expondremos a continuación, y con el beneficio de la comparecencia de la parte apelada, se confirma la sentencia apelada.

I.

El 4 de mayo de 2020, el Sr. Ramírez presentó una demanda sobre cobro de dinero en contra de Master Link, su único accionista, director y oficial, Sr. Morales (en conjunto, los codemandados), la señora Aixa Quiñones Rodríguez y la Sociedad Legal de Gananciales compuesta por éstos[1]. En síntesis, adujo que, el 3 de febrero de 2012, el Sr. Morales, en su carácter personal y en representación de Master Link, lo contrató para que prestara sus servicios profesionales de supervisión como ingeniero civil en los trabajos de construcción del proyecto denominado *Rehabilitación de la Planta Generatriz de Culebra,* propiedad de la Autoridad de Energía Eléctrica (AEE). El Sr. Ramírez explicó que, conforme al referido contrato de servicios profesionales, éste recibiría un pago de $7,000.00 mensuales en contraprestación por sus servicios, pagaderos de forma bisemanal y hasta la fecha en que terminara el proyecto.

En la demanda, el Sr. Ramírez alegó que Master Link emitió los pagos bisemanales por la totalidad de lo pactado hasta el 10 de diciembre de 2014, fecha a partir de la cual comenzó a emitir pagos bisemanales parciales por una cantidad menor a la acordada, incumpliendo así el convenio de servicios profesionales. El demandante aseguró que prestó todos los servicios para los cuales fue contratado, así como otros servicios adicionales relacionados con el proyecto; tales como, asesoría, agrimensura, preparación de documentación para *extended overhead*, comunicados y reuniones con abogados, asesores externos y personal de la compañía de seguros, renta de equipo de construcción, entre otros. Todo lo anterior hasta el 2 de marzo de 2016, fecha en que decidió no

---

[1] El 14 de julio de 2020, el TPI dictó *Sentencia Parcial* de desistimiento voluntario sin perjuicio en cuanto a Aixa Quiñones Rodríguez y la Sociedad Legal de Gananciales. Véase, el expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC) en el caso AR2020CV00554, entrada 20.

continuar rindiendo servicios para los codemandados dado el incumplimiento del pago concertado de $7,000.00 mensuales. Según aseveró, el 16 de julio de 2017, remitió un correo electrónico dirigido a los codemandados solicitando la liquidación de las facturas pendientes de pago, que a esa fecha totalizaban $160,287.00.

El Sr. Ramírez manifestó que, a raíz del correo electrónico, las partes se reunieron los días 17 y 19 de julio de 2017, y acordaron ajustar la suma de $160,287.00 a una cantidad menor, ascendente a $123,394.44, condicionado a que la deuda tenía que ser satisfecha en su totalidad y de forma inmediata. Indicó que, el 21 de julio de 2017, el Sr. Morales le cursó un correo electrónico en el que acompañó un borrador de los acuerdos alcanzados en las reuniones del 17 y 19 de julio de 2017. Según alegó, en el referido borrador el Sr. Morales aceptó adeudar la suma de $123,394.44, pero, unilateralmente, incluyó términos de pago no acordados en las reuniones. Particularmente, condicionó el pago de la cantidad adeudada al resultado del pleito sobre incumplimiento de contrato que Master Link instó en contra de la AEE en cuanto al proyecto de Culebra, Civil Núm. K AC2016-0818.

Ante ello, el Sr. Ramírez explicó que optó por cursar a los codemandados una carta por correo certificado con acuse de recibo el 20 de diciembre de 2019, reclamando el pago de la totalidad de la suma ajustada de $123,394.44, más una partida por concepto de intereses al amparo de los parámetros establecidos por el Colegio de Ingenieros y Agrimensores de Puerto Rico (CIAPR). Expuso que los codemandados recibieron la misiva el 23 de diciembre de 2019.

Alegó el Sr. Ramírez que, a pesar de sus gestiones de cobro, los codemandados se niegan a pagar la cantidad ajustada. Al tenor, argumentó que la deuda era una líquida, vencida y exigible, y reclamó su pago. Además, solicitó el pago de $203,600.73 por

concepto de intereses legales por mora, computados al cinco por ciento (5%), desde el 17 de julio de 2017 hasta el 30 de abril de 2020, para un total de $326,995.20, más los intereses legales que se acumulen hasta su saldo total, costas gastos y honorarios de abogado.

Los codemandados presentaron su contestación a la demanda el 17 de junio de 2020. En esencia, admitieron la existencia del acuerdo, pero negaron que el Sr. Morales hubiera suscrito el mismo en su carácter personal. De igual forma, aceptaron que las partes se reunieron los días 17 y 19 de julio de 2017, pero negaron que en dicha reunión Master Link hubiera aceptado adeudar cantidad alguna.

Los codemandados explicaron que Master Link contrató al Sr. Ramírez para supervisar un proyecto de la AEE, que fue cancelado en octubre de 2014; que dicha cancelación le fue informada al Sr. Ramírez el 26 de noviembre de 2014, y que a partir de dicha fecha Master Link dio por finalizado el contrato de servicios profesionales con el Sr. Ramírez. No obstante, según se alegó, las partes acordaron de forma verbal que, a partir del 10 de diciembre de 2014, Master Link le pagaría al Sr. Ramírez $1,650.00 bisemanales por trabajos de oficina. Afirmaron que el Sr. Ramírez recibió la compensación $1,650.00 bisemanales hasta el 2 de marzo de 2016, fecha en que dejó de prestar servicios para Master Link.

Además, los codemandados objetaron la deuda reclamada y articularon que en la reunión llevada a cabo los días 17 y 19 de julio de 2017 propusieron al Sr. Ramírez unas alternativas de pago sobre las cuales nunca recibieron respuesta. Así pues, entre sus defensas afirmativas, alegaron que la deuda no es una líquida y exigible. Por otro lado, plantearon que la demanda no establecía hechos que justificaran la concesión de un remedio, por haberse verificado el pago o por prescripción parcial o total de la deuda.

Luego de varios incidentes procesales, el 28 de junio de 2022, notificada el 30 de junio del 2022, el TPI dictó una *Resolución* mediante la cual rechazó desestimar la causa de acción en contra del Sr. Morales, en su carácter personal. Posteriormente, el 25 de agosto de 2022, este foro apelativo emitió una *Resolución* por virtud de la cual denegó la expedición del auto de *certiorari* incoado por los codemandados para la revisión de la denegatoria de la solicitud de desestimación (KLCE202200845).

Así las cosas, el 9 de diciembre de 2022, las partes presentaron un *Informe Conjunto sobre Conferencia con Antelación a Juicio Enmendado*[2]. En igual fecha, presentaron una *Moción Conjunta en Cumplimiento de Orden Acompañando Prueba Documental.*[3]

El 7, 8, 9 y 10 de febrero de 2023, se celebró el juicio en su fondo. El demandante, Sr. Ramírez, presentó su propio testimonio. Por su parte, la parte demandada presentó los testimonios del codemandado Sr. Morales y la señora Annabelle Alicea Abreu. También el TPI admitió y marcó prueba documental.[4]

---

[2] En éste, las partes esbozaron las siguientes estipulaciones: (1) El 3 de enero de 2011, Master Link Corporation suscribió un contrato con la Autoridad de Energía Eléctrica de Puerto Rico para un proyecto denominado "Rehabilitation of Culebra Power Station"; (2) Conforme el contrato de servicios del 3 de febrero de 2012, el demandante, ingeniero Javier Ramírez González, fue contratado como supervisor de proyecto de la obra denominada como "Rehabilitación de la Planta Generatriz de Culebra"; y (3) Conforme el contrato del 3 de febrero de 2012, el demandante, ingeniero Javier Ramírez González, recibiría una compensación de $7,000.00 dólares mensuales pagaderos de forma bi-semanal. En el *Informe Conjunto,* las partes también ofrecieron una lista de la prueba documental estipulada en cuanto a su autenticidad, así como de la prueba documental y testifical que presentarían en el juicio. *Íd.,* entrada 113.

[3] En dicha moción, enumeraron la prueba documental estipulada, la prueba documental de la parte demandante y la prueba documental de la parte demandada, igualmente anunciadas en el *Informe Conjunto de Conferencia con Antelación a Juicio Enmendado. Íd.,* entrada 114.

[4] Durante la celebración del juicio, se admitió y marcó la siguiente prueba documental anunciada por las partes en el *Informe Conjunto de Conferencia con Antelación a Juicio Enmendado*: (A) **Estipulada**, solamente en cuanto a su autenticidad, y no el contenido: (1) Rehabilitation of Culebra Power Station, Contract 091253; (2) "Acuerdo Proyecto Culebra" del 3 de febrero de 2012; (3) (a) correo electrónico del 16 de julio de 2017 remitido por el señor Javier Ramírez González y dirigido al señor Carlos Morales Vázquez al cual se acompañó un enlace que contenía el documento titulado "Reclamación de Facturas Pendientes de Pago" y (b) anejo del Correo electrónico del 16 de julio de 2017 remitido por el señor Javier Ramírez González y dirigido al señor Carlos Morales Vázquez sobre "Reclamación de Facturas Pendientes de Pago"; (4) correo electrónico del 16 de julio de 2017 remitido por el señor Carlos Morales Vázquez y dirigido al señor Javier Ramírez González; (5) correo electrónico del 21 de julio de 2017 y el 5 de

El Sr. Ramírez testificó que el Sr. Morales le hizo el acercamiento para que trabajara en el proyecto identificado como Planta Generatriz de Culebra, en calidad de ingeniero gerente o *construction manager*. El 3 de febrero de 2012, firmaron el "Acuerdo Proyecto Culebra", conforme al cual "[l]os honorarios por la supervisión ser[ía]n a razón de $7,000.00 mensuales".[5] No obstante, el Sr. Ramírez explicó que, a pesar de no formar parte de los servicios contratados, adicionalmente realizó funciones de ingeniero residente, responsable de los trabajos de campo; atendió asuntos administrativos; y estuvo a cargo del *quality control* y los aspectos técnicos del proyecto.[6] También se desempeñó como oficial de seguridad en el proyecto y agrimensor.[7] Según dijo, para los trabajos de agrimensura, utilizó su propio equipo.[8]

Asimismo, el Sr. Ramírez expresó que la primera fase del proyecto comenzó el 13 de febrero de 2012. Sin embargo, al percibirse un fuerte olor a hidrocarburo la obra se detuvo por 6.4

---

noviembre de 2019 remitidos por el señor Carlos Morales Vázquez y dirigido al señor Javier Ramírez González; (6) cheque personal número 1078 del 26 de julio de 2017 por la suma de $3,898.77; (7) carta del 20 de diciembre de 2019 remitida por el demandante, Ing. Javier Ramírez González, dirigida al señor Carlos Morales Vázquez sobre "Facturas Pendientes de Pago"; (8) declaración de Ingresos de Hacienda sujetos a retención Forma 480.6(b) de Javier Ramírez en los años 2012, 2013, 2014, 2015, 2016 y 2017; (9) Certificado de Incorporación Master Link Corp.; (10) By-laws Master Link Corp.; (11) (a) Consentimiento Escrito del 2 de diciembre de 2009 suscrito por Carlos Morales; (b) Consentimiento Escrito del 13 de agosto de 2010 suscrito por Carlos Morales; (c) Certificado de Resolución Corporativa del 9 de febrero de 2011 suscrito por Karla Vélez; (d) Certificado de Resolución Corporativa del 25 de abril de 2011 suscrito por Karla Vélez; (e) Consentimiento Escrito del 2 de mayo de 2011 suscrito por Carlos Morales; (f) Consentimiento Escrito del 2 de diciembre de 2020 suscrito por Karla Vélez; (g) Certificado de Resolución del 7 de enero de 2021 suscrito por Karla Vélez. (B) **Prueba de la parte demandante**: (1) Rehabilitación Planta de Energía de Culebra, Especificaciones 0912653; (2) Estados de la Cuenta de Banco de Javier Ramírez González, cuyos últimos dígitos son 7658; (3) Reclamación de "Extended Overhead", Planta Generatriz Culebra, Contrato 2011-P00067 (Admitido pero con una admisibilidad limitada); (4) Reclamación de "Extended Overhead Parte II", Planta Generatriz Culebra, Contrato 2011-P00067; (5) Tabla en Excel que resume todos los gastos, página 37 (entrada 120 de SUMAC) y (6) Moción de Sentencia Sumaria Parcial del caso civil número K AC2016-0818. (C) **Prueba de la parte demandada**: (1) Cash Disbursement Journal a Javier Ramírez, años 2012, 2013, 2014, 2015, 2016 y 2019 sacados de Peach Tree; y (2) Desglose de Pagos a Javier Ramírez en los años 2012, 2013, 2014, 2015, 2016 y 2019 sacados de Peach Tree (Se da por no puesto lo que está en *highlights* y manuscrito, lo que se toma por evidencia es el Estado según impreso). *Íd.,* entradas 128-131.

[5] Transcripción de la vista celebrada el 7 de febrero de 2023, págs. 43-44, 46, 50, 60.

[6] *Íd.,* págs. 50-51.

[7] *Íd.,* págs. 51-52, 57, 61.

[8] *Íd.,* pág. 57.

meses (192 días).[9] Más adelante, el proyecto se paralizó por 13.15 meses adicionales. Mientras estuvo el proyecto detenido, el Sr. Ramírez indicó que continuó recibiendo el pago por sus honorarios de $7,000.00 mensuales.[10]

El testigo especificó que el proyecto se canceló el 31 de octubre de 2014, y que el Sr. Morales le continuó pagando los $7,000.00 mensuales hasta la última semana de noviembre de 2014.[11] Adujo que, en ese mes, el Sr. Morales lo citó a una reunión en la que le explicó lo sucedido y ofreció pagarle el 50% del salario. El Sr. Ramírez declaró que le indicó al Sr. Morales que estaba dispuesto a que se le pagara el 50% del salario, con la condición de que se le pagara el restante 50% una vez la compañía estuviera en posición de así hacerlo.[12]

El Sr. Ramírez indicó que luego de cancelado el proyecto de Culebra, preparó el *extended overhead* número 1 y número 2.[13] También trabajó en varias subastas a favor de Master Link y acudió a entrevistas con abogados para la preparación de la demanda contra la AEE y compañías aseguradoras. A su vez, declaró que realizó varios trabajos en la residencia del Sr. Morales y en la de un familiar de éste.[14]

El Sr. Ramírez indicó que decidió trabajar para Master Link hasta el 2 de marzo de 2016, porque, pese a sus incesantes reclamos, el Sr. Morales nunca le pagó el restante 50% del salario.[15] Puntualizó que en la factura por servicios profesionales reclamó el 50% adeudado desde el 26 de noviembre de 2014 hasta el 2 de marzo de 2016, y desglosó el importe reclamado[16]. De la misma

---

[9] *Íd.,* pág. 82.
[10] *Íd.,* págs. 83-84, 87.
[11] *Íd.,* pág. 88.
[12] *Íd.,* pág. 89.
[13] Según explicó, el *extended overhead* consiste en los gastos que tuvo Master Link (contratista) durante el tiempo que estuvo detenido el proyecto por causas ajenas a éste. Master Link reclamó dicho gasto a la AEE. *Íd.,* pág. 121, 148.
[14] *Íd.,* pág. 90.
[15] *Íd.,* pág. 89, 104-105.
[16] *Íd.,* págs. 108-113.

manera, justificó el desglose de la factura de cambios de orden y economía para el proyecto[17].

Respecto al reclamo por concepto de renta de equipos, el Sr. Ramírez afirmó que la factura se circunscribe al gasto o pérdida de productividad que le ocasionó el hecho de tener su equipo de agrimensura confinado en el proyecto detenido por 19.55 meses. Aseguró que no facturó el costo por el servicio de agrimensura.[18]

Finalmente, el Sr. Ramírez declaró que el borrador de la *Minuta y acuerdos entre Javier Ramírez y Carlos Morales en representación de Master Link para atender reclamaciones de comisiones otros pagos relacionados al proyecto de Culebra,* remitida por el Sr. Morales mediante correo electrónico del 21 de julio de 2017, no refleja el convenio habido entre las partes durante los días 17 y 19 de julio de 2017, específicamente respecto a la controversia relativa a la partida por concepto de nómina pendiente de pago[19] y los acuerdos de pago de la cantidad reclamada.[20]

El Sr. Ramírez puntualizó que, en las reuniones del 17 y 19 de julio de 2017, acordó con el Sr. Morales que la suma total reclamada en las facturas se pagaría en ese momento.[21] El testigo explicó que, toda vez que la minuta no reflejaba los acuerdos conforme fueron asumidos por las partes, optó por no presentar comentarios o sugerencia alguna en torno a ésta.[22] En su lugar, dijo que el 20 de diciembre de 2019, remitió una misiva al Sr. Morales en la que nuevamente reclamó el pago de la deuda y manifestó su inconformidad con las condiciones unilaterales impuestas por éste

---

[17] *Íd.,* pág. 113-116.
[18] *Íd.,* págs. 116-117; Transcripción de la vista del 8 de febrero de 2023, págs. 52, 113-114, 119-120, 130, 137-138, 143.
[19] Transcripción de la vista del 8 de febrero de 2023, págs. 43-44.
[20] *Íd.*, págs. 51-53.
[21] *Íd.*, pág. 53.
[22] *Íd.,* pág. 56.

para efectuar el pago.[23] Al no recibir respuesta, presentó la reclamación judicial.[24]

En el contrainterrogatorio, el Sr. Ramírez aceptó que el contrato de servicios del 3 de febrero de 2012 no fue objeto de enmiendas por escrito, sino que las enmiendas se hicieron en forma verbal.[25] De la misma forma, reconoció que en ese acuerdo Master Link se comprometió a pagarle $7,000.00 mensuales solamente por la gerencia del proyecto.[26]

A su vez, el testigo explicó el proceso para el cobro de las comisiones especificadas en el acuerdo del 3 de febrero de 2012 y admitió que, conforme al mismo, no se requería la presentación de facturas para cobrarlas. No obstante, afirmó que la información constaba documentada en las carpetas de archivo de la empresa.[27] Además, aclaró que, a pesar de que en los *extended overhead* dirigidos a la AEE no se incluyeron facturas por concepto de renta de equipo, cuando preparó dichos documentos, acompañó un recordatorio dirigido al Sr. Morales respecto a las cantidades que éste le adeuda por concepto de renta de equipo.[28] Por último, reiteró que, luego de la cancelación del proyecto, el Sr. Morales le pidió que continuara trabajando a tiempo completo con la condición de que se le iba a pagar el 50% restante una vez la empresa estuviera solvente.[29]

La parte demandada inició su turno de prueba con el testimonio del Sr. Morales. Éste declaró que mediante el acuerdo se comprometió a pagar al Sr. Ramírez $7,000.00 mensuales por el servicio de administrar el proyecto.[30] No obstante, expresó que,

---

[23] *Íd.,* págs. 60-61.
[24] *Íd.,* pág. 63.
[25] *Íd.,* pág. 76, 83.
[26] *Íd.,* pág. 84.
[27] *Íd.,* págs. 97-98, 104-105.
[28] *Íd.,* págs. 165, 179.
[29] *Íd.,* pág. 154.
[30] Transcripción de la vista del 9 de febrero de 2023, pág. 62.

después de que la AEE canceló el proyecto, llegó a un acuerdo con éste para pagarle menos, debido a que no estaba ejerciendo tareas de ingeniero.[31] Según explicó, las partes acordaron que el Sr. Ramírez incluyera sus reclamaciones por concepto de salarios dejados de devengar y renta de equipo en los *extended overhead* objeto de la demanda presentada por Master Link contra la AEE, quedando la liquidación de tales reclamaciones sujetas al resultado de la referida acción judicial.[32]

En cuanto al equipo propiedad del Sr. Ramírez que se quedó confinado en el área del proyecto mientras éste estuvo detenido, el testigo interpretó que la orden de la AEE se refería más bien a los equipos pesados, cuyos costos de transportación resultaban altos, y no a los equipos pequeños, como el de agrimensura; razón por la cual, arguyó que el Sr. Ramírez pudo haber retirado su equipo del proyecto en cualquier momento.[33] Al respecto, puntualizó que el contrato del 2012 no contempla el pago por concepto de arrendamiento de equipo y que tampoco existe factura alguna por dicho concepto porque dicha reclamación había quedado sujeta al resultado del pleito que Master Link presentó en contra de la AEE.[34]

Además, el Sr. Morales expresó que le bajó el sueldo al Sr. Ramírez porque éste no estaba desempeñando funciones de ingeniero, sino que ejercía labores de estimador y ayudante de asuntos de la oficina. Abundó que las partes acordaron que al Sr. Ramírez se le volvería a pagar el salario de $7,000.00 mensuales si la empresa conseguía algún nuevo proyecto en el que éste volviera a tener el cargo de ingeniero administrador.[35] No obstante, afirmó que nunca acordó pagar la diferencia en sueldo.[36] Además, especificó

---

[31] *Íd.,* pág. 70.
[32] *Íd.,* pág. 71.
[33] *Íd.,* pág. 72, 153-154.
[34] *Íd.,* págs. 73-74, 76, 94, 95.
[35] *Íd.,* págs. 74-75, 87.
[36] *Íd.,* pág. 87.

que durante la relación laboral el Sr. Ramírez tampoco le exigió sueldos dejados de devengar.[37] Con ello, reiteró que la reclamación del Sr. Ramírez por salarios dejados de devengar dependía del resultado del pleito judicial instado por Master Link en contra de la AEE.[38]

Por otro lado, el testigo admitió que el Sr. Ramírez generó miles de documentos que fueron enviados a la AEE y que, de no haber sido por ese trabajo, Master Link se hubiera visto imposibilitado de presentar una reclamación por *extended overhead* en contra de la referida agencia.[39] También aceptó adeudar al Sr. Ramírez la suma aproximada de $19,000.00 por concepto de orden de cambio y economía para el proyecto.[40]

En el contrainterrogatorio, el Sr. Morales reconoció que, en la reclamación contra la AEE, Master Link incluyó en cada *extended overhead* una partida por concepto de renta de equipos de agrimensura.[41] A continuación, aceptó que dichos equipos pertenecen al Sr. Ramírez.[42] De igual forma, aseguró que el contrato suscrito entre éste y el Sr. Ramírez se enmendó de manera verbal.[43] A su vez, indicó que si la AEE le hubiera pagado a Master Link los *extended overhead*, él le hubiera pagado al Sr. Ramírez los salarios dejados de devengar y el alquiler de los equipos de agrimensura.[44]

El segundo testigo de la parte demandada fue la señora Anabel Alicea Abreu (Sra. Alicea). Ésta declaró que trabajó como contable de la compañía Master Link desde el 2006 hasta marzo del 2011.[45] Su trabajo consistía en registrar toda transacción monetaria de la empresa, una vez recibida la documentación de soporte.[46]

---

[37] *Íd.,* pág. 94.
[38] *Íd.,* págs. 85-86.
[39] *Íd.,* págs. 63-64.
[40] *Íd.,* pág. 64.
[41] *Íd.,* pág. 118.
[42] *Íd.,* pág. 116.
[43] *Íd.,* pág. 38.
[44] Íd., págs. 129, 140, 149.
[45] Transcripción de la vista del 10 de febrero de 2023, pág. 8.
[46] *Íd.,* pág. 9-10.

Explicó que el sistema de registro que utiliza la compañía, refleja los pagos realizados a favor del Sr. Ramírez por sus servicios profesionales y por concepto de rembolsos y *petty cash*.[47] Expresó que los pagos periódicos bisemanales del Sr. Ramírez fueron reducidos en algún momento.[48] También, detalló el proceso para el pago de comisiones y admitió que al Sr. Ramírez no se le pagó ninguna partida por concepto de comisión.[49]

El 13 de marzo de 2023, luego de evaluar la prueba desfilada, el TPI emitió la *Sentencia* objeto de revisión en este recurso. En su pronunciamiento, consignó las siguientes determinaciones de hechos:

1. Conforme a lo testificado por el codemandado, Morales Vázquez, éste es el único accionista, director y oficial de MLC.

2. El 3 de enero de 2011, MLC suscribió un contrato con la Autoridad de Energía Eléctrica de Puerto Rico (en adelante "AEE") para la construcción de un proyecto denominado *"Rehabilitation of Culebra Power Station"* (en adelante "Proyecto de Culebra"). [Exhibit Conjunto #1]

3. En lo pertinente a la controversia que nos ocupa, el contrato entre la AEE y MLC dispone que, como contratista de la obra, MLC suministraría toda la mano de obra, supervisión, equipo, herramientas, servicios, ingeniería, fabricación, construcción, pruebas, permisos, entre otros elementos necesarios para la rehabilitación de la planta generatriz de la AEE ubicada en el municipio de Culebra. [Exhibit Conjunto #1, Artículo 1]

4. Del precitado contrato, así como de sus especificaciones, también surge que MLC contrataría varios profesionales y empleados tales como gerente de proyecto, ingeniero residente, oficial de seguridad, agrimensor, entre otros. [Exhibit Conjunto #1, Artículos 12.7, 12.32 y 56.10; Exhibit #1 de la Parte Demandante, Página 1300-1, Artículo 1.3]

5. De conformidad a los testimonios del demandante, Ramírez González, y del codemandado, Morales Vázquez, no existe relación contractual alguna entre la AEE y el demandante por cuanto éste no participó en forma alguna de las negociaciones entre la AEE y MLC ni suscribió el referido contrato.

---

[47] *Íd.,* pág. 68, 70.
[48] *Íd.,* pág. 60.
[49] *Íd.,* pág. 75, 84.

6. El 3 de febrero de 2012, el demandante y el codemandado, Morales Vázquez, suscribieron un documento titulado "Acuerdos Proyecto de Culebra" para establecer unos acuerdos profesionales para la construcción del Proyecto de Culebra [Exhibit Conjunto #2]. En virtud del referido documento suscrito el 3 de febrero de 2012, las partes alcanzaron los siguientes acuerdos:

*A. Los honorarios por la supervisión será a razón de $7,000.00 dólares mensuales pagaderos de forma bi-semanal como servicios profesionales. Master Link Corp. (MLC) realizará las deducciones contributivas correspondientes.*

*B. Toda economía y cambio de orden logrado será recompensado [por] una comisión equivalente del 15% de ganancia obtenida. Este pago será realizado al momento de ser recibido el pago de la certificación correspondiente.*

*C. Los gastos de gasolina, mantenimiento, peaje y vehículo será sufragado por este servidor. De surgir otro trabajo al antes establecido, MLC reembolsará el incremento en gasto asociado.*

*D. Los gastos de transportación aérea, terrestre en la Isla de Culebra, estacionamiento, alojamiento y otros gastos relacionados para llevar a cabo mis funciones, será pagado como gastos reembolsables.*

*E. Los gastos de teléfono e internet serán sufragados por este servidor hasta el monto establecido por su plan de servicio. De haber algún incremento en exceso de la tarifa establecida, este sería sufragado por MLC.*

*F. Se proveerá de una tarjeta de crédito corporativa para cubrir todo gasto relacionado al proyecto.*

*G. Este servidor podrá prestar servicios a terceros siempre y cuando no interfiera con sus labores y funciones antes descritas.*

*H. De alguna de las partes querer prescindir de los acuerdos antes establecidos, deberá ser notificado con por lo menos 15 días con antelación a la fecha de su efectividad.*

7. A tenor con lo pactado en el inciso uno (1) del precitado acuerdo del 3 de febrero de 2012, MLC pagó al demandante la suma neta de $3,004.61 de forma bi-semanal desde el 23 de febrero de 2012. [Exhibit #2 de la Parte Demandante y Exhibit #2 de la Parte Demandada]

8. El 3 de abril de 2013, MLC remitió a la AEE una misiva suscrita por el demandante a la cual acompañó un informe certificado por la firma de Contadores Públicos Autorizados Vicente García C.P.A. & Co., P.S.C. mediante el cual MLC reclama a la AEE el pago

por gastos adicionales incurridos durante la obra por concepto de *"Extended Overhead"*, entre éstos, la renta de un equipo de mensura por 6.40 meses a un costo total de $11,200.00. [Exhibit #3 de la Parte Demandante]

9. El 22 de enero de 2015, MLC remitió a la AEE una segunda misiva suscrita por el demandante a la cual acompañó un segundo informe certificado por la firma de Contadores Públicos Autorizados Vicente García C.P.A. & Co., P.S.C. mediante el cual MLC reclama a la AEE el pago de otros gastos adicionales incurridos durante la obra por concepto de *"Extended Overhead"*, entre éstos, la renta de un equipo de mensura por 13.17 meses a un costo total de $23,047.50. [Exhibit #4 de la Parte Demandante]

10. Como parte de su testimonio, el codemandado, Morales Vázquez, declaró que, a finales del mes de noviembre del año 2014, a raíz de los problemas económicos que enfrentaba MLC como consecuencia de la cancelación de la construcción del Proyecto de Culebra, propuso al demandante que permaneciera trabajando, percibiendo el cincuenta por ciento (50%) del ingreso pactado en el inciso uno (1) del precitado acuerdo del 3 de febrero de 2012.

11. Conforme testificara el demandante, testimonio que nos mereció absoluta credibilidad, debido a la amistad que los unía, éste accedió al pedido del codemandado, Morales Vázquez, con la condición de que el restante cincuenta por ciento (50%) se le pagara de forma retroactiva, una vez Morales Vázquez y/o MLC contara con mayor liquidez.

12. Desde el 10 de diciembre de 2014 hasta el 2 de marzo de 2016, fecha en que el demandante decidió no continuar rindiendo servicios a los demandados, MLC pagó al demandante la suma neta de $1,502.30 de forma bi-semanal equivalente al cincuenta por ciento (50%) del ingreso pactado en el inciso uno (1) del precitado acuerdo del 3 de febrero de 2012. [Exhibit #2 de la Parte Demandante y Exhibit #2 de la Parte Demandada]

13. En consonancia a lo testificado por el demandante, cuyo testimonio nos merece absoluta credibilidad, durante el periodo del 10 de diciembre de 2014 y el 2 de marzo de 2016, éste rindió diversos servicios para los demandados, algunos relacionados al Proyecto de Culebra. Entre éstos, la preparación del *"Extended Overhead Parte II"* y entrevistas con el Lcdo. Henry Vázquez para la preparación de la Demanda de MLC en contra de la AEE sobre Incumplimiento de Contrato y Daños y Perjuicios.

14. Este Tribunal toma conocimiento judicial en torno a que el 25 de agosto de 2016, MLC radicó *Demanda* sobre Incumplimiento de Contrato y Daños y Perjuicios en contra de la AEE, Civil Núm. KAC2016-0818, mediante la cual solicita al Tribunal de Primera

Instancia que dicte Sentencia condenando a la AEE, entre otras cosas, a pagarle a MLC unas sumas de dinero por concepto de los gastos adicionales incurridos que surgen de los referidos "Extended Overhead", así como intereses por mora.

15. El 30 de septiembre de 2016, MLC radicó una *Moción de Sentencia Sumaria Parcial* en el precitado caso a la cual acompañó una declaración jurada del aquí codemandado, Morales Vázquez. Mediante dicha solicitud sumaria, MLC solicita al Tribunal de Primera Instancia que condene a la AEE a pagarle una suma de dinero que ha sido reconocida y aceptada por la AEE por concepto de los gastos adicionales incurridos que surgen de los referidos *"Extended Overhead"*. [Exhibit #6 de la Parte Demandante]

16. Mediante correo electrónico del 16 de julio de 2017, el demandante remitió al codemandado, Morales Vázquez, un documento sobre *"Reclamación Facturas Pendientes de Pago"* a través del cual reclama a los demandados el pago de la suma de dinero adeudada a esa fecha e incluyó las facturas pendientes de pago las cuales totalizaban ciento sesenta mil, doscientos ochenta y siete dólares ($160,287.00) [Exhibit Conjunto #3]. Particularmente, solicitó el pago de las siguientes partidas:

1. Servicios Profesionales - $7,797.55

2. Nómina Pendiente de Pago - $66,910.59

3. Orden de Cambio y Economía Para el Proyecto:

a. Economía Tanque Diésel - $7,368.50
b. Acero Estructural - $9,360.00
c. Louvers - $19,981.21
d. Varios Cambios - $1,543.19
e. Prefabricados - $13,507.20

4. Renta de Equipos de Agrimensura - $33,818.76

17. Según fuera testificado por el demandante, testimonio al cual este Tribunal otorga completa credibilidad, la factura por concepto de "servicios profesionales" corresponde, en síntesis, en entrevistas que éste tuvo con el Lcdo. Henry Vázquez para la preparación de la precitada demanda de MLC en contra de la AEE, caso KAC2016-0818.

18. A tenor con lo declarado por el demandante, testimonio que nos merece absoluta credibilidad, la factura por concepto de "nómina pendiente de pago" corresponde al pago retroactivo del cincuenta por ciento (50%") de los ingresos pactados en el inciso uno (1) del precitado acuerdo del 3 de febrero de 2012.

19. De acuerdo con lo testificado por el demandante, testimonio que nos merece absoluta credibilidad, la factura por concepto de "Orden de Cambio y Economía Para el Proyecto" corresponde al pago de comisiones

pactado en el inciso dos (2) del precitado acuerdo del 3 de febrero de 2012.

20. Conforme fuera testificado por el demandante, cuyo testimonio merece absoluta credibilidad, la factura por concepto de "Renta de Equipos de Agrimensura" corresponde a la renta de equipo de agrimensura que estuvo destacado en el Proyecto de Culebra por un período total de 19.57 meses y cuyo gasto por concepto de *"Extended Overhead"* es reclamado por MLC a AEE mediante la precitada Demanda.

21. El equipo de agrimensura utilizado en la obra era propiedad del demandante, conforme fuera declarado por el propio codemandado, Morales Vázquez.

22. A esa misma fecha, 16 de julio de 2017, el codemandado, señor Morales Vázquez, remitió correo electrónico al demandante confirmando una reunión a efectuarse el día 17 de julio de 2017, a las 10:00 am, con el propósito de discutir las facturas pendientes de pago por los servicios rendidos y solicitó al demandante llevar copia del contrato firmado entre ellos en el 2012. [Exhibit Conjunto #4]

23. De conformidad al testimonio del demandante, Ramírez González y del codemandado, Morales Vázquez, éstos se reunieron los días 17 y 19 de julio de 2017 y discutieron partida por partida cada una de las facturas pendientes de pago.

24. Con arreglo a lo testificado por el demandante y adjudicada la absoluta credibilidad que nos merece, las partes acordaron ajustar cada una de las partidas adeudadas a una cantidad menor con la condición de que dicha cantidad se pagara de forma inmediata.

25. El 21 de julio de 2017, el codemandado, señor Morales Vázquez, cursó al demandante, mediante correo electrónico, un *"Borrador de Acuerdo para reclamaciones de comisión del Proyecto Culebra"* que fue redactado por el codemandado, Morales Vázquez. [Exhibit Conjunto #5]

26. Del precitado correo electrónico remitido por el codemandado, Morales Vázquez, se desprende el siguiente mensaje: *"[F]avor comentarlo e incluir lo que entiendas necesarios [sic] para tratar de llegar a un acuerdo final sobre estas controversias. Pienso que el acuerdo que te envió [sic] recoge todo lo que discutimos más algunas cosas que le incluí que opino son a tú [sic]. Recuerda debemos nadar para el mismo lado tú al igual que yo tienes dinero pillado al lado de halla [sic], debemos movernos con agilidad antes de que cambien los personajes envueltos o pongan un síndico."*

27. Del referido "Borrador de acuerdo" se desprende, en lo pertinente, lo siguiente:

**Minuta y acuerdos entre Javier Ramírez y Carlos Morales en representación de Master**

**Link para atender reclamaciones de comisiones otros pagos relacionados al proyecto de Culebra.**

*1. Reclamación sobre economía en la fabricación del tanque se acordó $3,116.00 que surge de la economía en la fabricación del tanque que originalmente fue de $145,774.00 y finalmente costo $125,000.00 incluyendo el costo de flete. Hubo una economía de $20,774.00 X 15%= $3,116.00.*

*2. Reclamación sobre economía en los aceros se acordó $3,300.00 que surge de la cantidad que se tuvo en consideración al momento de cotizar que fue $127,000 - $105,000 (cantidad pagada) = $22,000.00 X 15% += $3,300.00.*

*3. Reclamación por servicios profesionales se acordó $3,898.77 esta factura corresponde en servicio prestado al Lic. Henry Vázquez.*

*4. Reclamación por comisión por cambios pequeños se acordó $1,235.00 que surge de una ganancia aproximada de $8,236 X 15%=$1,235.00.*

*5. Reclamación por economía en el pre-fabricado se acordó $1,750.00 que surge del costo utilizado en el estimado para la subasta y la cantidad finalmente pagada. $107,000.00 - $95,327.00 = $11,673.00 X 15% = $1,750.*

*6. Reclamación de los Louver se acordó un pago tipo lump sum por $10,000.00 como pago total sin entrar en detalles de fórmulas para determinar cantidad.*

*7. Sueldos dejados de devengar se acordó que se pagará a razón del porciento que la AEE page [sic] de la reclamación de extended overhead, excluyendo los trabajos realizados y el retenido.*

*8. Reclamación por renta de equipo de agrimensura y costo de agrimensura. Se acordó que lo que pague [sic] la AEE respecto a este punto será de Javier Ramírez sin ningún descuento.*

**Términos de pago acordados de los diferentes renglones de los diferentes renglones [sic]**

*1. Los renglones 1, 2, 4, 5, y 6 se acuerda un plan de pago a partir de la fecha que se firme este acuerdo. Este acuerdo constara de un pago fijo mensual durante 5 meses por $3,898.00. Con este pago final se extingue la deuda de comisiones del proyecto de Culebra, ambas partes reconocen que luego del pago final no habrá más reclamaciones sobre comisiones relacionadas al proyecto de Culebra.*

*2. El renglón 3 se pagó en el día 17 de Julio del 2017 con el cheque 1100 que le fue entregado al señor*

*Javier Ramírez. Los servicios brindados que cubre este pago están descritos en la factura 080820161 sometida por el ingeniero Javier Ramírez. Con este pago las partes acuerdan que los servicios brindados bajo la factura 080820161 fueron cubiertos en su totalidad, por lo que no podrá haber reclamaciones futuras sobre este servicio.*

*3. El renglón 7 reclamación por sueldos sin devengar esta partida, aunque no es reconocida por Carlos Morales se aceptó que se pague con la reclamación de extended overhead que se mantiene contra la AEE. La cantidad aceptada es de $65,000.00 incluyendo los intereses esta deuda no acumulara más intereses de los ya aceptados. Será pagada aplicándole el mismo por ciento de descuento que aplique la AEE a la reclamación de Extended Overhead excluyendo la cantidad que la AEE pague por concepto de retenido, trabajos realizados, daños [sic] y cualquier otro gasto no relacionado con el extended overhead. Con la cantidad que se pague queda salda la totalidad de la deuda sin tener derecho a reclamaciones posteriores.*

*4. El renglón número 8 que corresponde a alquiler y servicios de agrimensura se acordó que Javier Ramírez cobrará la cantidad que la AEE pague por estos servicios en la reclamación de "extended overhead". Carlos Morales rechaza cualquier pago a su favor sobre esta reclamación entendiendo que el equipo alquilado es de Javier Ramírez por lo que aceptó no hacer reclamaciones futuras sobre la partida reclamada en este inciso.*

28. Apartándose del contenido del "Borrador de Acuerdo" redactado por el codemandado, Morales Vázquez, la suma de $3,898.77 correspondiente a la factura 080820161 por concepto de "servicios profesionales" fue satisfecha al demandante el 26 de julio de 2017 mediante un cheque personal número 1078 emitido por la pareja consensual del codemandado, Morales Vázquez, señora Aixa Quiñones Berríos. [Exhibit Conjunto #6]

29. A tenor con lo declarado por el demandante, cuyo testimonio nos merece completa credibilidad, del referido "borrador de acuerdo" redactado y remitido por el codemandado, Morales Vázquez, surgen, correctamente, las sumas que las partes acordaron ajustar. Sin embargo, el codemandado, Morales Vázquez, incluyó condiciones no acordadas en las reuniones del 17 y 19 de julio de 2017, particularmente, condicionando el pago de las partidas adeudadas y ajustadas al resultado de la precitada demanda radicada por MLC contra la AEE en el Tribunal de Primera Instancia de Puerto Rico, Región de San Juan, caso número KAC2016-0818, así como la comparecencia del demandante como testigo de MLC en dicho caso.

30. Cónsono a lo declarado por el demandante y adjudicada la entera credibilidad que nos merece, el demandante no aceptó las condiciones de pago propuestas por el codemandado, Morales Vázquez, por las mismas no ajustarse a lo convenido en las reuniones del 17 y 19 de julio de 2017 toda vez el demandante aceptó los ajustes realizados con la condición de que dicha cantidad se pagara de forma inmediata.

31. Conforme testificara el demandante, testimonio que nos merece absoluta credibilidad, luego que el codemandado, Vázquez Morales, remitiera el precitado correo electrónico del 21 de julio de 2017, las partes sostuvieron varias comunicaciones verbales iniciadas por el codemandado, Morales Vázquez, con el propósito de contratar los servicios del demandante para desempeñarse en otros proyectos nuevos. No obstante, el demandante siempre condicionó cualquier acuerdo a que se le pagara la suma adeudada en su totalidad.

32. El 5 de noviembre de 2019, el codemandado, Morales Vázquez, cursó al demandante un segundo correo electrónico mediante el cual nuevamente remitió el *"Borrador de Acuerdo para reclamaciones de comisión [sic.] del proyecto Culebra"*. [Exhibit Conjunto #5]

33. Del precitado correo electrónico se desprende lo siguiente: *"[E]sto [sic] fueron los acuerdos a los que llegamos en nuestra reunión del 17 y 21 de julio de 2017. El 21 de julio de 2017 de [sic] llevaste el cheque 1100 por $3,898.17 pagando lo acordado del renglón tres luego te envie [sic] el acuerdo final para tus comentarios y firma y nunca recibí la respuesta"*.

34. El 20 de diciembre de 2019, el demandante cursó al codemandado, Morales Vázquez, una misiva sobre *"Facturas Pendientes de Pago"*. Conforme testificara el demandante, cuyo testimonio nos merece absoluta credibilidad, mediante dicha misiva éste reclamó a los demandados el pago de las partidas adeudadas aplicando el ajustado acordado en las reuniones de julio de 2017, cuya suma total asciende a **Ciento dieciocho mil seiscientos cuarenta y ocho dólares con cincuenta centavos ($118,648.50)**. [Exhibit Conjunto #7, Página 10]

35. Mediante la referida carta, el demandante admitió haber cobrado la factura número 08082161 correspondiente a la partida por concepto de servicios profesionales ascendente a $3,898.77 y solicitó el pago de las siguientes partidas aplicando el ajuste acordado:

1. Nómina Pendiente de Pago - $65,000.00

2. Orden de Cambio y Economía Para el Proyecto - $19,401.00
a. Economía Tanque Diésel - $3,116.00
b. Acero Estructural - $3,300.00
c. Louvers - $10,000.00
d. Varios Cambios - $1,235.00
e. Prefabricados - $1,750.00

3. Renta de Equipos de Agrimensura - $34,247.50

36. Conforme testificara el codemandado, Vázquez Morales, éste admitió adeudar al demandante la suma acordada de $19,401.00 por concepto de "Orden de Cambio y Economía Para el Proyecto".

37. Conforme testificara el codemandado, Vázquez Morales, también estaría dispuesto a pagar al demandante, de forma inmediata, las partidas por concepto de "sueldos dejados de devengar" y "renta de equipos de agrimensura" si la AEE pagara a la MLC las sumas reclamadas en la referida demanda, KAC2016-0818, por concepto de *"Extended Overhead"*. Conforme testificara el demandante, cuyo testimonio nos merece absoluta credibilidad, tal condición nunca fue acordada entre las partes. (Bastardillas y negrillas en el original).[50]

Cónsono con lo anterior, el TPI concluyó que, durante los días 17 y 19 de julio de 2017, los codemandados reconocieron adeudar al Sr. Ramírez las partidas que surgen de las facturas del 16 de julio de 2017, y que las partes acordaron ajustar cada una de las partidas a la suma total de $118,648.50. El tribunal destacó que el Sr. Morales aceptó que fue él quien redactó el borrador de acuerdo del cual surge cada una de las partidas ajustadas. Así, por ejemplo, enfatizó que el Sr. Morales reconoció adeudar al Sr. Ramírez la cantidad de $19,401.00 por concepto de comisiones que se desprende de los incisos 1, 2, 4, 5 y 6 del referido borrador.

Asimismo, el TPI resolvió que el Sr. Morales aceptó el resto de las sumas reclamadas. Ello pues, porque el Sr. Morales había declarado estar dispuesto a pagar las partidas por concepto de "nómina pendiente de pago" ($65,000.00) y "renta de equipos de agrimensura" ($34,247.50) si Master Link ganaba el pleito que instó en contra de la AEE por concepto de *extended overhead.* El TPI concluyó que tales declaraciones no eran cónsonas con un deudor que niega adeudar las cuantías reclamadas.

---

[50] *Íd.,* entrada 132.

Al tenor, dado el hecho de que la AEE no contrató con el Sr. Ramírez, el TPI coligió no conceder credibilidad al testimonio del Sr. Morales en torno a que las partes acordaron que el pago de las partidas estuviese condicionado al resultado de la demanda que Master Link instó contra la AEE.

En cambio, el TPI concedió entera credibilidad al testimonio del Sr. Ramírez, consistente en que la suma ajustada debía pagarse en su totalidad de manera inmediata y sin condición alguna. Por lo anterior, el TPI dedujo que los acuerdos alcanzados los días 17 y 19 de julio de 2017 constituyen una obligación contractual líquida, vencida y exigible, que debió ser pagada en su totalidad de forma inmediata y sin condición alguna.

Además, resolvió que los codemandados eran responsables solidariamente del pago de la suma adeudada. A tales efectos, el TPI concluyó que las actuaciones del Sr. Morales demostraron que su participación en los acuerdos no fue únicamente en calidad representativa de Master Link. Así, destacó que tanto para el 3 de febrero de 2012, como para los días 17 y 19 de julio de 2017, el Sr. Morales era el único accionista, director y oficial de Master Link. Asimismo, puntualizó que, aunque el acuerdo del 3 de febrero de 2012 fue realizado por Master Link, el Sr. Morales suscribió dicho acuerdo sin referencia alguna a que su comparecencia era en representación de Master Link. De igual forma, mencionó que, aun cuando del "borrador de acuerdo" redactado por el Sr. Morales surge que su comparecencia es "en representación de Master Link", en varios de sus incisos éste hacía referencia a su persona, sin hacer aclaración o hincapié que actuaba en representación de Master Link.

Así, por ejemplo, el TPI reseñó que el pago emitido a favor del Sr. Ramírez el 26 de julio de 2017, por la suma de $3,898.77, correspondiente a la factura 080820161 por concepto de "servicios

profesionales", no lo realizó Master Link, sino que fue la pareja consensual del Sr. Morales, la señora Aixa Quiñones Berríos, lo que, a juicio del tribunal, demostraba que, aunque Master Link podía hacer pagos y retenciones, realmente era el Sr. Morales, en su carácter personal, quien efectuaba la contratación con éste en una relación simbiótica con su empresa. En fin, el TPI sentenció que el Sr. Morales no había aportado prueba que demostrara que su participación hubiera sido en representación de su empresa.

A tenor con lo anterior, el TPI declaró con lugar la acción de cobro de dinero y, consecuentemente, condenó a los codemandados Master Link y Sr. Morales a pagar solidariamente al Sr. Ramírez las sumas correspondientes a las siguientes reclamaciones: $65,000.00 en nóminas pendientes de pago, $34,247.50 por renta de equipos de agrimensura y $19,401.00 en comisiones por órdenes de cambio; para un total de 118,648.50, más los intereses por mora devengados desde el 19 de julio de 2017.

Oportunamente, los codemandados presentaron una solicitud de reconsideración. En esencia, cuestionaron la adjudicación de credibilidad y evaluación de prueba que llevó a cabo el TPI para conceder las partidas de $65,000.00 por concepto de nómina pendiente de pago y $34,247.50 por renta de equipos de agrimensura. Arguyeron que, según las admisiones del Sr. Ramírez durante la vista en su fondo: (1) ocurrió una novación del contrato cuando se le notificó la cancelación del convenio habido entre Master Link y la AEE, reduciéndosele la compensación por sus servicios, y (2) no hubo contrato de arrendamiento de equipos ni facturación alguna a Master Link por dicho concepto. Por tanto, solicitaron al TPI que eliminara de la sentencia la concesión de las referidas partidas. También objetaron la determinación de responsabilidad solidaria.

Mediante orden emitida y notificada el 30 de marzo de 2023, el TPI declaró sin lugar la solicitud de reconsideración.

Inconforme, el 13 de abril de 2023, los codemandados Master Link y Sr. Morales (en adelante, parte apelante) instó el presente recurso y apuntaron los siguientes señalamientos de error:

> 1. Erró el Honorable TPI al concluir en su determinación de hechos #10, 11, 12, 18 y 24 que la reclamación del señor Javier Ramírez por sueldos sin devengar o "nómina pendiente de pago", provienen del acuerdo suscrito el 3 de febrero de 2012, y que constituyen hechos probados que la parte demandada acordó pagar esta partida a la parte demandante.

> 2. Erró el Honorable TPI al concluir en su determinación de hechos #8 y 9 que existía un contrato de arrendamiento entre Master Link Corp. y Javier Ramírez por concepto de arrendamiento de equipo de agrimensura cuando la parte demandante declaró y admitió que nunca hubo un contrato de arrendamiento por equipo entre la parte demandante y Master Link Corp., la parte demandante también admitió que no facturó el pago por ese equipo en arrendamiento hasta el verano de 2017, y también declaró la parte demandante que este equipo solo había sido utilizado por unos días.

Luego, mediante *Moción en Cumplimiento de Orden* de 21 de junio de 2023, la parte apelante presentó la transcripción de la prueba oral del juicio celebrado, con la anuencia del Sr. Ramírez. Por lo cual, aceptamos la transcripción presentada como estipulada por las partes.

Luego, el 31 de julio de 2023, la parte apelante presentó su *Alegato Suplementario*.

Por su parte, el 28 de agosto de 2023, el Sr. Ramírez presentó su *Alegato de la Parte Apelada*. En éste, adujo que el dictamen emitido por el TPI está sustentado en la prueba que tuvo ante su consideración, según corroborado mediante la transcripción presentada.

II.

-A-

Sabido es que los tribunales apelativos no debemos intervenir con las determinaciones de hechos y la adjudicación de credibilidad de los tribunales de primera instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba.[51]

Esta deferencia judicial está predicada en que los jueces de las salas de instancia están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo.[52] Solamente se podrá intervenir cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba.[53]

No obstante, incurre en pasión, prejuicio o parcialidad "aquel juzgador que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que [se] someta prueba alguna".[54] Lo que constituye pasión, prejuicio o parcialidad dependerá de las circunstancias particulares de cada caso. Por tanto, ante una alegación de pasión, prejuicio o parcialidad los foros apelativos deben evaluar si el juzgador cumplió su función judicial de adjudicar la controversia conforme a derecho y de manera imparcial. Solo así el foro apelativo puede descansar en las determinaciones de hechos de las salas de instancia.[55]

Por otro lado, ocurre error manifiesto cuando "la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente

---

[51] *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778 (2022); *E.L.A. v. S.L.G. Negrón-Rodríguez*, 184 DPR 464, 486 (2012).

[52] *Pueblo, v. Hernández Doble,* 210 DPR 850, 864 (2022), citando a *Santiago Ortiz v. Real Legacy, et al.,* 206 DPR 194, 219 (2021).

[53] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011), citado en *Santiago Ortiz v. Real Legacy, et al.,* supra, pág. 219.

[54] *Ortiz Ortiz v. Medtronic,* supra, citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 782 (2013).

[55] *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 777 (2013).

imposible o increíble".[56] Así, surge el error manifiesto cuando, de un análisis de la totalidad de la evidencia, el tribunal apelativo queda convencido de que se cometió un error, aunque haya evidencia que sostenga las conclusiones de hechos del tribunal inferior. Ello es particularmente cierto cuando el tribunal descansa exclusivamente en una parte de la prueba, mientras hubo otra prueba que la contradijera.[57]

En consecuencia, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de primera instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida "no existe base suficiente que apoye su determinación".[58] Las diferencias de criterio jurídico no cumplen con el referido estándar de revisión.[59]

Ahora bien, cuando las conclusiones de hechos se basan en prueba documental o pericial, los tribunales apelativos están en idéntica posición que el tribunal inferior para evaluarla. Por ende, el tribunal apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de dicha prueba, "y hasta para descartarla, aunque resulte técnicamente correcta".[60]

-B-

Es norma conocida que, en nuestro ordenamiento jurídico, como regla general, el peso de la prueba en toda acción civil recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.[61] Cónsono con lo anterior, la obligación de presentar evidencia recae primeramente sobre la parte que sostiene la afirmativa en el asunto en controversia.[62] Por ello, la obligación

---

[56] *Ortiz Ortiz v. Medtronic,* supra, citando a, citando a *Pueblo v. Toro Martínez,* 200 DPR 834, 859 (2018).
[57] *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 793 (2020).
[58] *Íd.,* pág. 794.
[59] *Íd.*
[60] *Santiago Ortiz v. Real Legacy, et al.,* supra.
[61] Regla 110(A) de Evidencia, 32 LPRA Ap. VI R. 110(A).
[62] Regla 110(B) de Evidencia, 32 LPRA Ap. VI R. 110(B).

de presentar evidencia y persuadir al juzgador de la existencia de los elementos esenciales de una reclamación recae sobre el demandante.[63]

En los casos de naturaleza civil, la determinación del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad.[64]

-C-

En una acción de cobro de dinero, el demandante viene obligado a establecer que es acreedor de una deuda válida existente; que la deuda no se ha pagado y que el demandado es el deudor.[65]. En cambio, el demandado tiene que aportar prueba de la extinción de la obligación.[66]

El Artículo 1042 del Código Civil de 1930 dispone que las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia.[67] En cuanto a los contratos, el Art. 1044 del mismo código dispone que, "las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos".[68] "Consecuentemente, un contrato existe desde que una o varias personas prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio".[69] Es por ello, que el Artículo 1054 de ese código sujeta a aquellos que de alguna manera contravengan sus obligaciones a la

---

[63] *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894, 913 (2011).
[64] Regla 110(F) de Evidencia, 32 LPRA Ap. VI R. 110(F).
[65] *General Electric v. Concessionaires, Inc.,* 118 DPR 32, 43 (1986).
[66] El Art. 1168 del Código Civil de 1930 establece que le "[i]ncumbe la prueba de las obligaciones al que reclama su cumplimiento, y la de su extinción al que la opone. 31 LPRA ant. sec. 3261. Aludimos a las disposiciones del derogado Código Civil de 1930 por estar vigente al momento de los hechos que generaron esta controversia. El Código Civil de 1930 fue revocado y sustituido por la Ley Núm. 55-2020, conocida como el *Código Civil de Puerto Rico.* Conforme al Art. 1812 del Código Civil de 2020, 31 LPRA sec. 11,717, los contratos celebrados conforme al régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos los efectos según la misma.
[67] 31 LPRA ant. sec. 2992.
[68] 31 LPRA ant. sec. 1994.
[69] *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448, 455 (2014).

indemnización de los daños y perjuicios causados.[70] Bajo dicho supuesto, todo incumplimiento contractual dará lugar a un resarcimiento.[71]

Los contratos serán válidos si concurren tres elementos: consentimiento, objeto y causa.[72] A su vez, "[l]os contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".[73] El principio de la autonomía contractual que rige en nuestra jurisdicción "permite que las partes contratantes establezcan los pactos, las cláusulas y las condiciones que entiendan convenientes".[74] Esa autonomía estará limitada únicamente, y el contrato será nulo e inexistente, si este último resulta contrario a las leyes, a la moral o al orden público.[75]

Asimismo, el Artículo 1210 del Código Civil de 1930[76] establece que los contratos se perfeccionan desde el mero consentimiento entre las partes. Además, dispone que obligan tanto al cumplimiento de lo expresamente pactado, como a las consecuencias que sean conformes a la buena fe, al uso y la ley, según la naturaleza de lo pactado.[77] "En tales casos, cualquiera de las partes contratantes puede impugnar el contrato, aunque se haya beneficiado del mismo".[78]

A su vez, es norma conocida en materia de interpretación de contratos que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas"[79]. Por el contrario, "[s]i las palabras

---

[70] 31 LPRA ant. sec. 3018.
[71] *Álvarez v. Rivera,* 165 DPR 1, 18 (2005).
[72] Art. 1213 del Código Civil de 1930, 31 LPRA ant. sec. 3391.
[73] Art. 1230 del Código Civil de 1930, 31 LPRA ant. sec. 3451.
[74] *Rodríguez Ramos et al. v. ELA et al.,* supra, págs. 455-456; Art. 1207 del Código Civil, 31 LPRA ant. sec. 3372.
[75] 31 LPRA ant. sec. 3372; *Rodríguez Ramos et al. v. ELA et al.,* supra, pág. 456.
[76] 31 LPRA ant. sec. 3375.
[77] *Íd.*
[78] *Íd.*
[79] Artículo 1233 del Código Civil, 31 LPRA ant. sec. 3471.

parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas". Asimismo, ante la diversidad de sentidos que pueda contener una cláusula, se deberá, en claro principio de la conservación del contrato, interpretar en el sentido más adecuado para que el contrato tenga efecto.[80]

III.

En esencia, nos corresponde determinar si el Sr. Ramírez tiene derecho a cobrar las partidas por concepto de "nómina pendiente de pago" y "rentas de equipos de agrimensura".

En su primer señalamiento de error, la parte apelante indica que el TPI erró en la apreciación de la prueba al resolver que la reclamación del Sr. Ramírez por concepto de sueldos sin devengar o "nómina pendiente de pago" provienen del acuerdo suscrito el 3 de febrero de 2012, y que la parte demandada acordó pagar esta partida al Sr. Ramírez.

La parte apelante aduce que el acuerdo del 2012 específicamente se contrajo para los trabajos de supervisión para el proyecto de Culebra, a razón de $7,000.00 mensuales; que en el referido acuerdo las partes consintieron que cualquiera de éstas podía rescindirlo con la mera notificación, que ello ocurrió cuando el Sr. Morales le informó al Sr. Ramírez sobre la cancelación del proyecto en noviembre de 2014; y que hubo una novación verbal de dicho contrato cuando el Sr. Ramírez aceptó seguir trabajando en las oficinas administrativas y subastas por la cantidad de $1,750.00 bisemanales. Añadió que el Sr. Ramírez aceptó dicha cantidad como pago total de sus servicios durante dieciséis (16) meses, sin haber reclamado pago adicional durante dicho periodo. La parte apelante articula que no existe prueba en el récord que demuestre que Master Link acordara pagarle al Sr. Ramírez un 50% adicional por concepto

---

[80] Artículo 1236 del Código Civil, 31 LPRA ant. sec. 3474.

de nómina de manera retroactiva basado en el acuerdo del 2012. Puntualizó que Master Link solamente consintió a pagar la cantidad ajustada de $65,000.00 por concepto de "nómina pendiente de pago" condicionado al resultado de la demanda K AC2016-0818.

Por su parte, el Sr. Ramírez arguye que la prueba demostró que accedió a recibir el 50% del salario pactado en el acuerdo del 3 de febrero de 2012, con la condición de que se le pagara el 50% restante de manera retroactiva tan pronto la empresa contara con mayor liquidez. De otra parte, asevera que acordó ajustar las cuantías reclamadas, incluyendo, "nómina pendiente de pago" y "rentas de equipos de agrimensura", con la condición de que la cantidad reclamada fuera pagada en su totalidad y de manera inmediata, sin sujeción a ningún evento futuro. Veamos.

La prueba desfilada en el juicio demostró que, el 3 de febrero de 2012, las partes suscribieron un acuerdo para establecer las directrices que regirían la relación profesional para el proyecto de Culebra. Conforme con dicho acuerdo, Master Link pagaría a favor del Sr. Ramírez $7,000.00 mensuales por la supervisión del proyecto, pagaderos de forma bisemanal. A tenor con lo pactado, Master Link pagó al Sr. Ramírez la suma acordada a partir del 23 de febrero de 2012.

No obstante, la AEE canceló el proyecto de Culebra en octubre de 2014. Entonces, y a raíz de los problemas económicos que dicha cancelación representó para Master Link, el Sr. Morales le propuso al Sr. Ramírez que permaneciera trabajando para su empresa percibiendo el 50% del ingreso pactado en el acuerdo del 3 de febrero de 2012. Así pues, a partir del 10 de diciembre de 2014, y hasta el 2 de marzo de 2016, Master Link pagó al Sr. Ramírez el 50% del salario pactado en el 2012.

El TPI concedió credibilidad a la versión del Sr. Ramírez en cuanto a que las partes pactaron que éste continuaría trabajando

para Master Link por el 50% del salario convenido con la condición de que el restante 50% se pagara de manera retroactiva una vez la corporación contara con mayor liquidez. También confirió credibilidad al testimonio del Sr. Ramírez referente a que la deuda relacionada con la "nómina pendiente de pago" corresponde al pago retroactivo del 50% de los ingresos pactados en el 2012. A su vez, creyó que el ajuste de la deuda se realizó con el propósito de que ésta fuera satisfecha en su totalidad de manera inmediata.

La parte apelante cuestiona la credibilidad que le otorgó el juzgador de los hechos a la prueba desfilada. Sin embargo, es norma reiterada que la evidencia directa de un testigo que merezca entero crédito será prueba suficiente de cualquier hecho.[81] Conforme dicho principio, la adjudicación de credibilidad que realizó el foro de primera instancia merece nuestra deferencia, por ser dicho foro quien tuvo ante sí a los testigos y dirimió el comportamiento de éstos al declarar.

De la prueba surge que el Sr. Morales testificó que, después que la AEE canceló el proyecto, llegó a un acuerdo con el Sr. Ramírez para pagarle la mitad del salario que hasta entonces había recibido. Surge, además, que la partida de "nómina pendiente de pago" corresponde al pago retroactivo del 50% de los ingresos pactado. En su testimonio, así como en el borrador del acuerdo que éste remitió al Sr. Ramírez el 21 de julio de 2017, el Sr. Morales condicionó la reclamación correspondiente a "nómina pendiente de pago" al resultado del pleito judicial instado por Master Link en contra de la AEE. A base de ello, el TPI concluyó que la parte apelante aceptó adeudar la partida, pero no creyó que las partes hubieran acordado la referida condición.

---

[81] Regla 110 (D) de Evidencia, 32 LPRA Ap. VI, R. 110 (D).

Habiendo considerado el TPI las versiones conflictivas y adjudicado cuál testimonio le fue más creíble o razonable, no nos corresponde, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, intervenir en la apreciación de la prueba que éste hizo.

Por otro lado, la parte apelante manifestó que el TPI incidió al determinar que existió un contrato de arrendamiento por equipo de agrimensura entre Master Link y el Sr. Ramírez, cuando éste admitió que el acuerdo del 2012 no contempla el pago por concepto de arrendamiento de equipo, que sólo había utilizado el equipo por unos días y que no facturó el pago por ese equipo en arrendamiento hasta el verano de 2017.

Según testificado por el Sr. Ramírez, la factura por concepto de "renta de equipo de agrimensura" corresponde al gasto o pérdida de productividad que le ocasionó el hecho de tener su equipo de agrimensura confinado en el proyecto por un periodo total de 19.57 meses, cuyo gasto Master Link reclamó a la AEE en la acción judicial en cobro de dinero relacionado en los *extended overhead*.

De otra parte, en el contrainterrogatorio, el Sr. Morales admitió que, en el pleito contra la AEE, Master Link incluyó una reclamación en cada *extended overhead* por concepto de renta de equipos de agrimensura. Además, aceptó que dicho equipo pertenece al Sr. Ramírez. De la misma forma, y al igual que ocurrió con la partida correspondiente a "nómina pendiente de pago", el Sr. Morales también aseveró que estaría dispuesto a pagar al Sr. Ramírez el importe por concepto de "renta de equipos de agrimensura" si Master Link resultaba favorecido en la reclamación judicial que instó en contra de la AEE. A juicio del TPI, ello constituyó una aceptación de la deuda que, a tenor con el resto de la prueba creída, debió ser satisfecha en su totalidad de forma inmediata a las reuniones de julio de 2017.

Las determinaciones de hechos encuentran apoyo en los testimonios que fueron vertidos en el juicio y a los que la sala sentenciadora confirió credibilidad. En su dictamen, el TPI indicó a qué testigo le concedió credibilidad y a cuál no y por qué. Basado en ello, consignó los hechos probados y adjudicó el pleito. La parte apelante no aportó evidencia que contradijera las determinaciones del TPI de manera que nos moviera a sustituir su criterio por el nuestro. Tampoco articuló fundamentos convincentes para sustentar sus alegaciones. Así pues, la parte apelante no esbozó razones meritorias para que este Tribunal pudiese concluir que el TPI erró al determinar, luego de emitir numerosas determinaciones de hechos al respecto, que el Sr. Ramírez incumplió con su deber de establecer los elementos necesarios para probar su causa de acción.

En fin, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, los tribunales apelativos no debemos intervenir con la apreciación de la prueba de los foros primarios. Esta deferencia responde a que son éstos los que tienen la oportunidad de recibir y apreciar toda la prueba testifical presentada, de escuchar la declaración de los testigos y de evaluar su comportamiento. La parte apelante no demostró que el TPI hubiera incurrido en perjuicio, parcialidad o error manifiesto, por lo que no habremos de intervenir con su apreciación de la prueba.

En vista de lo anterior, en el presente caso no encontramos razones para variar las determinaciones y conclusiones emitidas por el TPI. Así pues, concluimos que no se cometieron los errores señalados, razón por la cual procede confirmar el dictamen apelado.

No obstante, y como consideración adicional, resulta apropiado señalar que la disposición para lograr el buen funcionamiento del ente gubernamental no es responsabilidad única del Estado y su sistema de fiscalización; también, es función de cada ciudadano. La deshonestidad es un profundo problema

humano desde tiempos ancestrales capaz de socavar cualquier institución pública o privada. De los hechos ante nuestra consideración se desprende que dos profesionales reclaman al Estado el pago de varias sumas por concepto de *Extended Overhead.* Por un lado, el contratista de la obra reconoce que adeuda al ingeniero ciertas cuantías objeto del reclamo al Estado solamente si este último las paga, pero no si le toca costearlas de su propio pecunio. Por el otro, el ingeniero, que asiste al contratista en la petición de reembolso al Estado, a su vez, le reclama al individuo el pago en su totalidad y niega que su pago esté condicionado al reclamo hecho al Estado. Entendemos que nos toca a todos, en nuestros distintos entornos combatir este mal, fiscalizando y levantando nuestra voz en aquellas instancias en las que nos parezca que estamos ante situaciones cuestionables. Por tal razón, en nuestra función judicial, corresponde referir los hechos que tenemos ante nuestra consideración al Departamento de Justicia para su evaluación.

IV.

Por las razones anteriormente expresadas, se confirma la sentencia apelada. Se refieren los hechos del presente caso a la atención del Departamento de Justicia.

Notifíquese.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones